All rise. Please be seated. Next case on this morning's docket is the case of Henley, Vicki Henley and George Ripplinger and Zimmer v. Christie Schaaf. It is the Labdino, Oaks and Schaaf. And we have Mr. Ripplinger that's going to be arguing for the appellant. And we have Pat Zimmer also arguing for a lesser period of time. And we have Jonathan Freed for the appellant who may begin, Mr. Ripplinger. May I please have the court? Contrary to the listing out in the hallway, it's not Henley v. Ripplinger. I'm really the lawyer. Well, I'm a little concerned about that. That's what it says. Daniel, that's what it says. I saw that and I called the clerk's office and it still says that. But that's not the case. I'm not being sued. I am given the appeal because of some contempt findings that were made by the trial. Okay. Well, perhaps that's how it's designated that way. Right. I will spend 15 minutes of the 20 minutes arguing the appeal of Henley v. Schaaf. And my partner, Patricia Zimmer, will use five minutes of that to discuss the contempt findings and, of course, five minutes for rebuttal, which I will take. Maybe leave some for her. Five minutes isn't much to deal with. What we have here is really has a lot to do with the fact of this trial. This case was tried three times. And the first trial began August 20, 2012. The second trial was April 29, 2014. And the third and final trial, which is why we're here, was 5-12-15. Now, you would think that it would be clear what happens after a mistrial. But, in fact, the case law is very slim. After the first trial, we decided that we wanted to add some witnesses. One in particular was an expert witness. We did not call expert witness in the first trial because we did not believe the expert, the defense, was very believable since he was trying to tell us he knew you could see the stop sign even though the tree was down and he went to see it. Obviously, that was not the case because we had a mistrial. Now, the case, the principal case involving mistrials in Illinois is the village of Lakemore v. First Bank. The holding in that case was a mistrial vitiates all prior proceedings and, in legal effect, is equivalent to no trial at all. The previous trial proceedings were completely erased as if they had never taken place. And both the claimant and the case are returned to the pretrial stage. Now, following the first trial, I read that we were starting over again or could start over again. And we filed 91 days before the trial was scheduled. It didn't go to trial the day it was scheduled. It was originally scheduled 91 days following, more than 91 days, in April of the next year. And within 91 days of the trial, we filed a list of additional witnesses with their names, their addresses, the subject of their testimony, and in the case of Mr. Hanson, who was our expert, a traffic reconstructionist and a human factors expert, we filed a multi-page disclosure of what his opinion would be if called at the next trial. The ruling in the court at that time was that the original pretrial ruling before the first trial, 60 days held that discovery was cut off 60 days before the first trial, which would have been June 20, 2012, and that you couldn't add anything. Now, that caught me somewhat by surprise. The court said that part of that order said that you had to ask permission to add additional witnesses. So, again, we're going back to this old order, at which time I filed a motion. I spoke correctly. I filed a motion for permission to add witnesses, and it was denied. Those motions then, well, before the second trial, Judge Lieberman recused himself from the case, and Judge Clark, who at that time was the chief judge. Can I ask you what reason was given for his refusal? The reason was to avoid the appearance of impropriety. And I was confused about that. Yes. Judge Lieberman and I do not see eye-to-eye, as sometimes happens, and Judge Lieberman, according to the statements that were given to me by employees of the Superior Clerk's Office, Judge Lieberman walked in with an order signing me in contempt, saying that he didn't like me, I didn't like him, and that he was just going to show me what he could do to me, at which time I filed some subpoenas, because the employees did not want to give voluntary statements, to take evidence depositions of those employees. The defense filed a motion to quash. These are all in the record, in this case? Yes, ma'am. They're in the record. The defense filed a motion to quash the subpoenas. Judge Lieberman quashed the subpoenas, and the next day withdrew from the case, based upon the appearance of impropriety, as he wrote in his order. We were going to take those depositions to support a potential motion for substitution of judges, and, of course, once he moved out of the case, we no longer needed to do that. And we got Judge Clark, and, again, the case was continued, because now we got a new judge, and the record in this case is about six bankers' books large, and so at that time, it was probably around two, and the judge needed time to bring himself up to speed, and so the trial was continued. I immediately filed a new motion to add additional witnesses, and that was denied. Again, based on the timeliness of my disclosure, it should be pointed out that the defense did not file 213-F in her order for expert witnesses, but we did make that disclosure way back, and it was denied. The court, Judge Clark, put the position throughout that the original scheduling order, going back to the 2012 trial, applies to the subsequent trials, and basically denied my motion before each trial, and there was one point, we were just getting ready to go to trial, and I filed a petition with the Supreme Court for a supervisory order, and the Supreme Court stayed in the trial for a temporary time and decided not to do anything about it. So there really is no Illinois case that directly answers the question? You know, I read you the quote from the Illinois case. Right. Now, that's... It's your position that that answers the question, because it starts all over again in every case. That might be the one that all started all over again. That means that we were on a clean slate. We could proceed, we could add witnesses, we could add evidence, we could do anything we wanted to do at that point. The court has taken the position that that's not true, that you still had that time, and that you had to make your disclosure before the first trial, and you are stuck with it, untimely. Did you have a witness that passed away or was unavailable? We had a witness that passed away. We had his discovery deposition. Unfortunately, that was before the change in the rule, which allowed you to use discovery deposition. And he was one of the primary people who complained about the blockage of the stop sign. The stop sign was on 5th and Metropolis. The lady who planted the tree, the stop sign was on the corner when we planted the tree on the city right away. And next door to that was a funeral home. And the dead witness was the county coroner at one time and also owned that funeral home and lived in that location. And he complained to the mayor at various times about this tree blocking the stop sign. Now, he died, and we attempted to bring his deputy coroner in who also worked at the same location to testify in his place about what he had observed. That was not allowed. During the first trial, in a very conservative clerk at Farmer, he was familiar with that intersection, and he was not allowed to testify. My fault, I forgot to list the plaintiff's daughter on the witness list. We attempted to put her back on the witness list, but we were denied. I mean, her testimony would have been cumulative. We understand that, but as a courteous head, I would have liked to have put her on the stand to testify about her mother. But that just went on and on and on, and we never did get to put those witnesses on over a course of three years, which would have given ample time and opportunity for discovery and depositions and anything else you could see. But again, and that's why it's important for this court to make this decision, because I think that both the courts and the lawyers in this state need some guidance about what exactly you can do or not do in a retrial. Because if you have to come in and try a case exactly the same way over and over again, it's like Groundhog Day, the movie. Here we are. Even Judge Clark made the statement at one point, you know, the definition of idiocy is doing the same thing over and over again in the same exact way and expecting a different result. Well, we didn't really do that. So it's not necessarily going to be Groundhog Day. But I can see your point in that there are certain things that can't be controlled because of the passage of time that would happen after a mistrial, where I guess the mistrial generally is not attributed to neglect or something on a party's side. Anyway, we tried a case for two weeks. Each one of these were approximately two weeks long. When you try a case for two weeks, you get some insights into the case. When you talk to jurors following a trial, you get some insights into a case. And we decided that we needed more eyewitnesses. We decided we would like to have an expert witness into the case. For example, their expert testified that if you see any piece of red behind that tree, you should know what the stop sign is. Well, that's not how human people work. I mean, you're looking for a stop sign, perhaps, but just seeing that little patch of red is going to make you put your foot on the brake, necessarily. Maybe, if somebody's very cautious, they would do that. But we believe we really needed that kind of witness in this case. The expert is probably the most important of the whole thing. Were you sanctioned? Was I sanctioned? Yes. Or held in contempt. I was held in contempt multiple times. It wasn't ruled on until the end of the third case. I was sort of like having a sort of dental fleas hanging over your head while you're trying to sneeze. And I was not penalized in any way. The only person who was penalized in this case was my client for not supplementing her radicals. And I would submit to the court that anyone who should be penalized for not supplementing her radicals is me, certainly not my client. But that's not how the law works. Right. And I was never penalized in any way. There was a threat of making me pay the cost of defense in the first trial. A very fee bill was submitted, approximately $65,000, I believe. And I had no problem with the timekeeping. It was a difficult trial, a long trial. At the end of the third trial, the judge decided that he was not going to require me to pay it. Truly an odd situation in some ways, but that's the way it was. Now I'm looking at an ARDC complaint, trying to figure out if they can do something to me because of that. But then he decided to defer things until it was court-ordered. So it's an issue that has to be resolved in some way. And that's related to the ARDC? Approximately $5,000 from the ARDC. And that relates to the first trial? The first trial. Okay. I thought that there was a sanction related to the fact that there was no supplemental disclosure of the fact that the plaintiff had a subsequent lawsuit? Yes. There was a client who was involved in a collision a week before the first trial. It did not affect her condition except a temporary increase in pain. And you have to understand that she was already taking narcotic medication on a daily basis to deal with that pain, having had several back and neck surgeries. But you made that opinion, or arrived at that opinion, and then chose not to disclose the lawsuit? I chose not to disclose the lawsuit because there wasn't a question in the interrogatories pertaining to whether there had been a subsequent accident or lawsuit. There was a lawsuit at that time. It was a decision made right before trial. The court held that the fact that they asked for additional medical, if there had been additional medical, made that obligation for me to report that second accident because she was going to emergency room. And if that's the way it is, that's the way it is, and I stand corrected. But as a practical matter, it had little effect because all of that information came out during the second and third trials. And we still had it on the jury in the second trial. We finally had it in the defense version of the third trial. And the doctor testified that there was no permanency. There was a slight temporary increase in pain levels, but no permanency. That's the way it was. I have made mistakes in my life. I regret them. But I didn't believe that that set of interrogatories required an answer. I've been corrected. I may have been. I guess I'm not at all. But I don't think that it justifies any of the things that happened in the trial in this case. What you think may have been related, is that what you mean by that? I don't think that the fact that she was in a fender bender and had a brief increase in pain caused much damage in the case. There's irrelevant information out there, in my opinion. The whole big deal about her father in another trial and a case in Kentucky, what that had to do and why that had to be introduced in this case, I don't know. They went over the pleadings, the notice of state. So you have really very few facts in the case. I don't believe it should have come in. That is irrelevant and material. It has nothing to do with the case in chief. They did make one change, though, in the second pair of trots. That is, Judge Clark decided he could use his foot. Now, if you notice, there's the stops that we were talking about. There's the tree, our trees. That was taken from the other side of the intersection. The defendant's driver was traveling this way, not this way. This is an outtake from a film, a film from the day of the collision by Paducah television station. We found out that they had been out there, and we got a hold of film. It was after the fact that they were panning around, crashed cars, overturned over, whatever, and at the end of the film, the videographer follows a police car, which you see right here, and swings by and gets the picture of the stop sign and the tree. We have a copy of that made. It was produced to the defense three years before the first trial. We took an evidence deposition of the videographer shortly before the first trial just to establish the origin of the film. Judge Lederman allowed us to use that deposition and the picture in the first trial. Thereafter, we could not use it because Judge Clark held that it was untimely. On what basis? I have the foggiest idea. He quoted Sullivan, and Sullivan had used it in 2013. But it was disclosed, and it was disclosed again in the subsequent... Well, it was disclosed in 2009. We sent them a copy of it. And they had all that time. We weren't allowed to use it in the second and third trials. The defense was allowed to use photographs taken in the winter when there were no leaves on the trees. And that's a deciduous cedar? It's a cedar. I mean, a lot of cedars are ferns or what have you. And that got into other issues about amending our complaint to talk about trees and the tree. We were not allowed to amend our complaint at all during that period of time, even though we asked to amend it multiple times. The complaint had been amended twice. We amended it two days after it was filed because of a typo, and then we amended it once after a motion to dismiss was allowed under one count, and we had to correct the pleadings to do that. And that was early on, maybe in the first year. Never allowed to amend it thereafter. Okay. Mr. Rickland, Jerry, you'll have the opportunity to respond. Thank you. I think I used it. Did I use it the first time? I did. So have you kept his time separate? It was 15 minutes. That's what I understood. They said I was told that they would let you have their time. Okay. So you showed that they used 20 minutes, is that what you're saying? Yes. Okay. Sorry. Mr. Freed? Yeah, I'm all right. Okay. Okay, please report. The courts confronted in this appeal is a definitive example of the worst problems that plague the civil justice system as a whole, and at the same time, the importance and value of the rule of law that the rule of law occupies in the landscape of civil justice. In the appeal of Ms. Henley's case, which I'll address first, five of the 10 issues that are raised by the appellant, Ms. Henley, are concerned evidentiary rulings by the court. And it's our position, as stated in our brief, that under the authority of Brown v. Decatur Hospital, since these evidentiary issues were never presented to the trial court in a post-trial motion, we don't have the benefit of Judge Clark's insight, we don't have the benefit of his response, we don't have the benefit of a record for this court to review and apply the very stringent standard of abuse of discretion. And so we don't think it is proper for this court to indulge Ms. Henley's appeal on any of the evidentiary issues that they raise because we can't hear from Judge Clark about them. In fact, in the appendices that we filed, you will see Judge Clark's order of September 11, 2015, on post-trial motions, in which Judge Clark himself observes that here I am in September of 2015, hearing a case that was tried for the third time, second by me, in May of 2015, four months ago, and wouldn't it have been nice for me to be presented with the true assignments of error on these evidentiary issues that were never raised? And in his opinion, he says, it's for another court to decide whether this constitutes waiver, but I can't address it. And so we do believe it's waiver. Nonetheless, our brief contains arguments addressing each and every one of the evidentiary arguments that were raised on appeal under this abuse of discretion standard. But I would commend to you that your analysis of any of these arguments, about Exhibit 35, about amending the complaint about any of these things with the abuse of discretion standards involved, that your analysis should be informed by the context in which these arose, the timing and the sequence in which these evidentiary issues and discretionary issues were all presented, first to Judge Lieberman and then to Judge Clark. Well, is it true that Judge Clark took the position that you cannot raise, bring in new evidence, period, that is different than the first trial? No, that's an oversimplified presentation of the context in which... Or new witnesses that were not disposed in the first trial. He took the position, Judge Clark did, conducting his own independent hearing on these matters. To put this in context, the trial in August 2012 was held, despite Ms. Henley's concealed motor vehicle accident in which she injured the very same body parts that she was making a claim for. She was excused from court repeatedly by Judge Lieberman, professing problems. I'm getting sidetracked here, Judge Chapman. Back to your question. After the 2012 trial, we get to January 2013 when we first learn about  So in January 2013, Judge Lieberman... We had a trial set in 2013. He said, let's put that trial off and I need more information. I need to see whether this motor vehicle accident amounts to anything or not. So we had another year's worth of discovery. And finally in January of 14, he reviewed the testimony from her neurosurgeon and so on. And he said, yes, this is of consequence. She went to the hospital the day of the motor vehicle accident complaining of severe pain in the same body parts. She went through her mental health counselor the next day. I don't know how this is going to affect her impact on the trial schedule. Three days later on August 16, following the motor vehicle accident, she was in the office of her treating doctor neurosurgeon, who's already performed surgery on her. And his testimony is contained in our brief. It's worth noting that at the time of the court's decision on the sanctions order, January 14 of 14, the only testimony available to him is the testimony we cited. It was from Dr. Orendel's discovery deposition earlier that year, not his later evidentiary deposition. Because the evidentiary deposition gets cited. So after issuing this sanctions order, finding that it was clearly a violation of the rules to conceal a motor vehicle accident from the court and from opposing counsel, upon the determination by counsel that it's a temporary injury, which he could never have determined himself at the time. In addition to the sanctions order there, Judge Lieberman in January issues an order barring certain witnesses from being presented that were just revealed at that point in time. Now, let's take Judge Clark's position in this case. Judge Lieberman recuses on March 20 of 2014. And I will register, as we put in on page 5 of our reply brief, we have a footnote that more accurately describes the context of these off-the-record, outside-the-record accusations about bias that, frankly, are a very disappointing and ethically troubling to me, to walk into a courtroom and say that a judge is biased without following the established procedure that's set forth in the rules, which would have required a motion with affidavits or other clause to be shown. But it got put in his brief, and we've addressed it in our reply brief. And I think that outside-the-record accusations of bias certainly are not valid for an appeal. But Judge Clark takes this case over in March 2014 and has a trial set to begin on April 30. From the time that he takes this case over, he has read the entire trial transcript of eight volumes of testimony. He has worked endlessly to prepare himself. He's issued three pointed evidentiary rulings reinforcing hearsay, reinforcing relevance, and reinforcing orders of court. And this is where I sort of got off on this, the rule of law. He undertakes it like a professor would to a first-year law student about what's admissible and what's not admissible so we don't repeat the same mistakes that occurred the first time around. And I say mistakes. They were the most consummationist acts that Judge Lieberman has ever seen in 25 years. They were not mistakes. I have a little misspeaking on my part. I was going to say, are we going to find that in the record? Yes. I have briefed that quite extensively. There's multiple witnesses. There were inlimiting orders entered on typical tort case subjects like prior and subsequent accidents, like accidents at this intersection. And Judge Lieberman went through and he ruled it was our motion to delimit the effect. He said, we don't want evidence of other accidents at this intersection. He said, well, I'm going to deny that motion, but I'm going to ask and request that substantial similarity of those accidents be shown. And his order says, and we would expect you to approach the bench with an offer of that evidence before it's presented to the jury. So all these routine tort evidentiary rulings that trial jurors have to make, Judge Clark familiarized himself, issued his own orders, and he was rewarded on the second day of trial with testimony that prompted him, not my motion or anything, prompted him to find Mr. Ricklipper in contempt for deliberately violating the same exact orders that he had just entered. And I've cited in my brief, and I've attached to the appendix, the actual interaction between Mr. Ricklinger, who very contritely says to the court today that, you know, he's made mistakes, he's made mistakes. Well, these were not mistakes, ladies and gentlemen. These were deliberate, repeated, willful violations. That's a finding in the contempt order. And if you read the transcripts, you, I think, would adopt Judge Clark's conclusion to that effect. I was certainly embarrassed by it when I saw it, besides being frustrated for my client for the second time around to have a trial impacted in that way. So the context in which all this occurs, and to bring it more current, Judge Chapman, to the last time that he tried to bring an expert involved, of course, Judge Lieberman addressed it independently and said, no, we're not going to let an expert come in here where you've caused a delay in the case by failing to disclose discovery evidence. And our interrogatory number 11 may not follow the Illinois form, although we have local counsel throughout the entire practice of this case. But it asked if you'd ever been treated by a medical doctor after July 20th of 2006 when this accident happened. Very simple. You could have said, yes, last week I was involved in a car accident, went to the hospital, went to see my doctor, and here's what happened. Of course it's required. There's not anybody in this case who believes it should have been withheld unilaterally by counsel based on a decision that he made concerning what he believed to be relevant or irrelevant. That's not the rule of law operating here. So by the time it gets to Judge Clark for the third trial, which occurs in 2015, about May, we've had the mistrial of May of 2014 to occur. Judge Clark resets the trial for July of 2014. And then the day before the trial set to start, Mr. Rick Lieber files this supervisory order with the Supreme Court of Illinois to take control of the case, which is rejected in September of 2014. And lo and behold, here we are in 2014, December, arguing about when the case should be reset. So the first available time we can go is May of 2015. And it's only in December of 2014 that Judge Clark is then faced with nine new witnesses and an expert. And he, in his discretion to keep control of this case, says we're not going to start all over again here. We are now 11 years or 10 years after the accident. We've now had two trials. And, you know, one of the opinions I've received of the sanctions order or the contempt order raises the interesting question of, I think it was Judge Clark's order, do we have a tactical effort being made here to discover what the defense's case is going to be and then take advantage of it by now adding or subtracting proof in our case? And he basically looks at all these things. In December 14, January 15, he rules we're not going to start all over again here. And we cited at page, I think, 21 of our brief, numerous out-of-jurisdiction cases which would support the idea that you don't get a blanket restart button every time a mistrial is declared. It's up to the discretion of the trial judge to manage a case that's now been pending since November of 2007. And we are in 2015, and we still don't have time. And so that, to me, is the standard by which Judge Clark's analysis of this case should be the prison through which it should be viewed. I don't know if there are any other procedural questions, but I appreciate the opportunity to, in a very, very lengthy record, give you a snapshot of what we believe a trial judge properly should do to exercise his discretion to keep this case moving forward. As it turns out, I think the proof that he presented to you here from this videographer who Mr. Ricklinger or somebody in his office then exerts a still that is pixelated, poorly defined. You can't tell one tree from another in Exhibit 35. Witnesses testified to them. Is this the cedar tree branch or another tree branch? They can't tell you that from Exhibit 35. But they can tell you from other exhibits, including the ones he offered, that his exhibits show that there were other trees impacting the stop sign, perhaps in those photographs, but they couldn't identify the cedar tree, and all of them on his evidence said they could still see some of the stop sign. But the definitive issue in the case is, was the stop sign obstructed? And the jury was presented with a special interrogatory on that, and the jury found it was not even obstructed. So while this theory and this other evidence, some of the evidence was already presented one time and resulted in this trial, this is the kind of thing that a trial judge deals with routinely and did in this case. And we think it's a terrible disservice to the efforts of Judge Clark to sit here and say that, well, he wouldn't let me make my complaint. He wouldn't let Mr. Lieberman make his complaint because he deliberately inserted in the complaint theories of recovery that were dismissed and discharged already by the court. There's no duty to have tree police inspect foliage in municipalities. We have Judge Lieberman wrote an eight-page opinion analyzing the Tory Immunity Act. And so what happens? We have rulings based on that analysis. Judge Clark comes in and he re-performs his own analysis about notice, about defect or dangerous condition. But the presence of a tree universally is not a dangerous condition. It's only when a tree grows and impacts those things around it that it matters. And in this case, on July 22nd of 2006, it didn't matter. We have a jury to tell us that unanimously based on all the reasonable evidence that could have been presented and mustered. And so that's the evidence part of this that has me so enamored at this point. The two legal parts of it that propped up again, I think one was addressed certainly by the finding that there was no instruction to the stop sign of all that day. And then the second part, the second evidence here, the second legal issue is the instruction proper on sole proximate cause. And the evidence of the case was that the driver who caused this accident, who ran into this intersection past the supposedly obstructed stop sign, and you'll see this in the appendix. Mr. Agent's exhibits give you a view of the distances involved. Ms. Sutton, the tour feeser, was charged with failure to yield by the officer. Overwhelming evidence in the case from the officer, from an impartial witness, Clyde Wills, from the insurance adjuster herself for Ms. Sutton, Heather Websick, an attorney in Carbondale, from the property owner, Tina Dunn, to four or five witnesses in this case, all said that the tree was not obstructing the stop sign that day. But if you disregard all those things, the sole proximate cause argument hinges on this. Mrs. Sutton passed the cedar tree, and there were still three lanes of traffic comprising about 45 feet before she hit Ms. Henry. In advance of the intersection, 45 feet, three lanes of traffic, there was another 30 feet past the cedar tree where the stop sign was that there was no testimony about any obstruction once she passed the cedar tree. She had about 80 feet to stop her vehicle, to swerve her vehicle, to avoid traffic, and she didn't see anything at all because she simply wasn't paying attention. Made no effort to apply her brakes. Made no effort to swerve. There was another vehicle that almost hit her. She didn't even see that vehicle. And so the instruction on the sole proximate cause was certainly most appropriate and certainly resolves the issue of the case independent of these claims that we should have regular inspections of foliage by municipalities even when no obstruction exists. We should have regular tree police even though there's no obstruction present. And so those are the legal issues on the appeal. Those are the evidentiary issues on the appeal. On the sanctions, we would mandate,  from this district, in which unquestionably sanctionable behavior resulted in an award of attorney's fees for a trial that was definitely unnecessary for an act of futility. Had the accident of a week before trial, August 13, 2012, been disclosed, that trial would have been put off. No one would have had the expense of it. We could have waited until we reached a point of maximum medical improvement. We could have proceeded on and saved ourselves at least one trial. And if my time's up, I'll stop. And if there are other questions, I'll proceed. No questions. There are no more questions. And your time is up. Thank you. Thank you for your arguments, Mr. Roethlanger or Ms. Zimmer. I don't know how you want to proceed with your rebattle. Just one thing. I'll ask the court to take a look at my post-trial motion. I think we specifically raised all those issues within the post-trial motion. Frankly, I didn't know what the judge probably thought about it. I guess he expected us to write a brief on each issue. But we have briefed it and briefed it and briefed it. And I don't think anybody had any question about what the issues were. They were all raised, specified, the lack of being able to amend the complaint, the lack of being able to name additional witnesses. Every issue in this appeal was raised in that. Mr. Sturgey, we will review this as a record. Thank you all for your briefs and your arguments. And we'll take this matter under advisement. And once again, we're needing to recess briefly to assemble our different panels.